CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 1 2 2009

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

TERRELL MOORE,                          )
                                        )
            Petitioner,                 )      Case No. 7:08CV00526
                                        )
v.                                      )
                                        )      MEMORANDUM OPINION
                                        )
GENE M. JOHNSON, DIRECTOR,              )      By:  Glen E. Conrad
                                        )      United States District Judge
            Respondent.                 )

Petitioner Terrell Moore, a Virginia inmate proceeding pro se, brings this action as a

petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254.  In his petition, Moore

challenges the validity of his confinement pursuant to the 2005 judgment of the Circuit Court for

Tazewell County, Virginia, under which he stands convicted of first degree murder and

sentenced to life in prison.  Respondent filed a motion to dismiss, and Moore responded, making

the matter ripe for decision.  Upon review of the record, the court finds that the motion to dismiss

must be granted.

### Background

In its order of August 11, 2006, denying Moore's direct appeal, the Court of Appeals

of Virginia summarized the evidence as follows:

> The evidence showed that [Moore] had a long-term relationship with [Sarah]
> Jackson and also had a relationship with the victim [Brandi Hatfield].  Jackson,[1]
> who at the time was staying in a motel room with [Moore], testified [Moore] stole
> some checks from the victim and she and [Moore] cashed the checks on several
> occasions.  Jackson also stated the victim confronted [Moore] about the stolen
> checks, and on May 29, 2003, [Moore] told Jackson he was going to the victim's
> apartment to make arrangements to repay her for the checks.  [Moore] returned to
> the motel room at 1:00 a.m., and he told Jackson the victim was not at home.
> Jackson fell asleep and was awakened when [Moore] returned to their motel room
> at 6:00 a.m., wearing a different shirt.  [Moore] told Jackson the victim had agreed
> to accept the money.  Later, after Jackson learned the victim was dead, [Moore]

---

[1]  Jackson was initially charged as Moore's co-defendant on charges of conspiracy and murder
related to Hatfield's death.  She testified on direct, however, that she had reached an agreement allowing her
to enter a no contest plea to a misdemeanor charge of being an accessory to murder after the fact in exchange
for her testimony against Moore in the murder trial.  (Trial Tr. 106, Feb. 17, 2005.)

told Jackson to tell the police he was with her all night. Jackson also stated that [Moore] changed into new clothes after he learned the police wanted to interview him, stating that he did not want the victim's "hair or anything on" him while he was being questioned.

Brenda Fitzgerald, a neighbor of the victim, testified that on May 29, 2003, she heard [Moore] and the victim discussing checks. Fitzgerald also saw [Moore] with the victim at the apartment complex at about midnight that night. A witness testified that he gave [Moore] a ride from the victim's apartment complex to a motel at 12:30 a.m. A taxi driver testified that he picked up a man, who gave the name "Mike," from a motel at about 2:00 a.m. and took him to the victim's apartment complex. At about 4:00 or 4:30 a.m., Fitzgerald heard "bumping" sounds coming from the victim's apartment and she later heard water running in the kitchen of the victim's apartment. Sometime between 5:00 a.m. and 6:00 a.m., Fitzgerald saw [Moore] standing on a sidewalk in the apartment complex.

The victim's body was found in her apartment later that morning. She had been stabbed numerous times and died as a result of the wounds. Special Agent Santolla testified a mop and bucket containing solution were in the apartment, and there was evidence that the floors and walls may have been cleaned. There were no indications of a break-in at the victim's apartment.

Jamie Weiss, a convicted felon, testified that he met [Moore] while they were in jail together. Weiss also testified that [Moore] told him, "I know that I done it. They know that I done it. But knowing it and proving it is two different things."

[Moore] gave several statements to law enforcement. In all of the statements he said he visited the victim at her apartment until after midnight when someone gave him a ride to his motel room. [Moore] denied he returned to the victim's apartment later that morning. [Moore] testified he left the victim's apartment at about 11:30 p.m., visited another resident of the apartment complex, then caught a ride to his motel room, arriving there at about 12:30 a.m. Contrary to his prior statements, at the trial he testified he took a taxi back to the victim's apartment at about 3:00 a.m. He stated he gave the name "Mike" to the taxi company. [Moore] testified he previously lied to law enforcement about returning to the apartment complex because he purchased drugs when he went back there and he did not want the police to find out about the purchase. [Moore] stated that he bought drugs, smoked the drugs, then returned to the motel room. [Moore] also admitted that, after the offense, he purchased new clothes and changed into those clothes before he met with police. [Moore] denied that he killed the victim.

(Record No. 1777-05-3, Order 8-9, Aug. 11, 2006.) ("Ct. App. Order").

Moore stood trial for murder before a Tazewell County jury. On February 19, 2005, jurors found him guilty of first degree murder in the death of Brandi Hatfield and recommended a

- 2 -

sentence of life imprisonment and a $100,000 fine.[2] (CR03-2011-00.) On June 27, 2005, the court sentenced him in accordance with the jury's recommendations. One judge of the Court of Appeals of Virginia denied Moore's appeal by order dated April 20, 2006, and after rehearing by a three-judge panel, the court denied the appeal again by order dated August 11, 2006. (See, gen. Ct. App. Order.) The Supreme Court of Virginia refused his subsequent appeal to that court on December 12, 2006 by summary order. (Record No. 061857.)

Moore also pursued state habeas relief. Even before the conclusion of his direct appeal, on August 13, 2007, he filed a petition for a writ of habeas corpus in the Circuit Court for Tazewell County, raising the following claims for relief:

1. Trial counsel were ineffective for failing to object to the prosecutor's misstatement of facts pertaining to the potential testimony of Mary Burwell;

2. Trial counsel were ineffective for failing to proffer to the trial court the expected testimony of two material witnesses for the defense (Mary Burwell and Angela Hairston);

3. Trial counsel were ineffective for failing to move the trial court to introduce exculpatory evidence of two witnesses, Mary Burwell and Angela Hairston through the testimony of Detective Tim Sargent and Angela Moore;

4. Trial counsel were ineffective for failing to call Angela Moore, who was a material witness;

5. Trial counsel were ineffective for "failing to secure objections made during voir dire in accordance with Rule 5:25";

6. Trial counsel were ineffective for failing to conduct additional voir dire on Juror Rita Howell;

7. Trial counsel were ineffective for failing to use a peremptory strike against Juror Rita Howell;

8. Trial counsel were ineffective for failing to object to the seating of Juror Jimmy Brown;

---

[2] In stating the crimes for which he was convicted and sentenced in this case, Moore refers to a conviction for "use of a weapon" for which he received a three-year suspended sentence. The record does not reflect that Moore was charged or sentenced for use of a weapon in this case, however, and he raises no habeas claims concerning this conviction.

- 3 -

9.     Trial counsel were ineffective for failing to object to the seating of Juror Danny Horton;

10.     Trial counsel were ineffective for failing to object to and move to strike Juror Donna Davis;

11.     Trial counsel were ineffective for failing to renew objection or object to the testimony of Sue Lockhart;

12.     Trial counsel were ineffective for failing to object to and move to strike the Commonwealth's improper character evidence;

13.     Trial counsel were ineffective for failing to interview, investigate, and cross examine Commonwealth's witness Nancy Tullock Stover;

14.     Trial counsel were ineffective for failing to object to Commonwealth's trial exhibits A, E, and H;

15.     The Commonwealth committed prosecutorial misconduct by introducing false evidence at sentencing regarding petitioner's prior criminal convictions;

16.     Appellate counsel was ineffective for failing to raise on appeal the issue that the trial court erred in not striking for cause Juror Rita Howell;

17.     Appellate counsel was ineffective for failing to raise on appeal the question, "Did the trial court abuse it's discretion by denying petitioner's motion to strike for cause Juror Dora Bowman?";

18.     Appellate counsel was ineffective for failing to properly argue on appeal that the trial court erred in permitting Sarah Jackson to testify about what kind of television programs petitioner liked;

19.     Appellate counsel was ineffective for failing to cite any legal authority when she argued on appeal that the trial court erred by permitting Levar Neal and Misty Mitchell to testify about what they saw in petitioner's hands; and

20.     Appellate counsel was ineffective for failing to cite any legal authority when she argued on appeal that the trial court erred in permitting Brenda Fitzgerald to testify about the statements she alleged were made about checks during a "conversation" between petitioner and the victim.

(Record No. CL07000328.) The Circuit Court for Tazewell County denied and dismissed

Moore's habeas petition on December 17, 2007 ("Cir. Ct. Order"). Specifically, the court found

that Moore's ineffective assistance claims did not satisfy the performance or prejudice prongs of

the two-part standard set forth in Strickland v. Washington, 466 U.S. 668, 687 (1984). The court

also held that the prosecutorial misconduct claim was procedurally defaulted under the rule in

- 4 -

<u>Slayton v. Parrigan</u>, 205 S.E.2d 680 (1974). Moore appealed the <u>habeas</u> judgment to the

Supreme Court of Virginia. That court refused his petition by summary order on June 24, 2008,

finding no reversible error. (Record No. 080582.)

Moore filed a timely § 2254 petition in this court, alleging the following grounds for

relief:

1.  Trial counsel was ineffective for failing to show the trial court in seeking a continuance that missing witness Mary Burwell was material to the defense and for failing to object to the Commonwealth's "deception" pertaining to Burwell's expected testimony;

2.  Trial counsel was ineffective for failing to call Detective Tim Sargent to the stand to lay the proper foundation the trial court required to cross-examine Sarah Jackson about an exculpatory statement that Jackson gave to Burwell;

3.  Trial counsel was ineffective for failing to further <u>voir dire</u> Juror Rita Howell to clarify to the trial court that she should have been stricken for cause and for failing to use a peremptory strike to remove her from the panel;

4.  Trial counsel was ineffective for failing to secure objections made during <u>voir dire</u> when he did not object to the jury as a whole in accordance with Va. Sup. Ct. R. 5:25;

5.  Trial counsel was ineffective for failing to renew the objection or to object to the testimony of Sue Lockhart immediately after she testified by giving reasons for his objection and moving for a mistrial or a cautionary instruction;

6.  Trial counsel was ineffective for failing to object and move to strike the Commonwealth's elicitation and response of improper character evidence from its principle witness, Sarah Jackson;

7.  Trial counsel was ineffective for failing to object to Commonwealth's exhibit A during the sentencing phase of petitioner's trial;

8.  Appellate counsel was ineffective for failing to raise on appeal the question, "Did the trial court abuse its discretion in denying petitioner's motion to strike for cause Juror Dora Bowman?"

9.  Appellate counsel was ineffective for failing to cite legal authority in support of her argument that the trial court erred in permitting Levar Neal and Misty Mitchell to testify regarding what they saw in petitioner's hands and in permitting Brenda Fitzgerald to testify about the statements she alleged were made about checks during a "conversation" between petitioner and the victim;

- 5 -

10.   Trial court erred in refusing to suppress the petitioner's statements given
      to Chief Deputy Harry Cundiff;

11.   Trial court erred in refusing to grant petitioner's motion to suppress the
      testimony of the Commonwealth's witnesses whose criminal records were
      not provided to petitioner timely pursuant to the trial court's discovery
      order;

12.   Trial court erred in refusing to suppress letters written by petitioner to
      Sarah Jackson, co-defendant, and particularly Commonwealth's exhibit
      No. 108;

13.   Trial court erred in permitting Sarah Jackson to testify about what kind of
      television programs petitioner liked; and

14.   The evidence was insufficient.

## Discussion

### A. Exhaustion

"A federal court may not grant a writ of habeas corpus to petitioner in state custody

unless the petitioner has first exhausted his state remedies by presenting his claims to the highest

state court." Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000). See O'Sullivan v. Boeckel,

526 U.S. 838, 842 (1999). To meet this exhaustion requirement, petitioner "must have presented

to the state court both the operative facts and controlling legal principles." Kasi v. Angelone,

300 F.3d 487, 501-02 (4th Cir. 2002) (internal quotations omitted). Respondent concedes that

Moore has exhausted his state court remedies as to all of the claims raised in his § 2254 petition.

He presented claims (1) through (9) to the Supreme Court of Virginia in his petition for a writ of

habeas corpus before that court. He presented claims (10) through (14) on direct appeal to the

Supreme Court of Virginia.

### B. Deference to State Court Adjudications

To the extent that the Virginia courts adjudicated Moore's claims on the merits, this court

is bound to follow the deferential standard set forth in 28 U.S.C. § 2254 as amended by the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). This section reads:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any

- 6 -

claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d). A state court adjudication is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the United States Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of the Court and nevertheless arrives at a result different from [its] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). "Where, as here, it is the state court's application of governing federal law that is challenged, the decision must be shown to be not only erroneous, but objectively unreasonable." Waddington v. Sarausad, 129 S. Ct. 823, 831 (2009) (internal quotations and citations omitted).

The Virginia courts' findings cannot be deemed unreasonable merely because they do not cite established United States Supreme Court precedent on an issue, even if they are unaware of such precedent, "so long as neither the reasoning nor the result of the state-court decision contradicts" such Supreme Court precedent. See Mitchell v. Esparza, 540 U.S. 12, 16 (2003). When a state appellate court dismisses an appeal with a summary order, the federal habeas court examines the last reasoned decision by a state court on the merits of the claim. See Ylst v. Nunnemaker, 501 U.S. 797, 801-02 (1991).

The federal reviewing court must also presume the state courts' determination of a factual issue to be correct, absent a showing of clear and convincing evidence to the contrary. § 2254(e)(1). A habeas petitioner is "entitled to an evidentiary hearing only to resolve disputed issues of material fact," and therefore, will not warrant a hearing unless he first presents "a colorable claim to relief by showing that the alleged additional facts, if true, would at least

- 7 -

arguably compel the granting of the writ."[3] Poyner v. Murray, 964 F.2d 1404, 1422 (4th Cir. 1992).

### C. Ineffective Assistance of Counsel

To prove that counsel's representation was so defective as to require that the conviction be vacated, petitioner must satisfy both prongs of a two-part standard by demonstrating that counsel's defective performance resulted in prejudice.[4] Strickland, 466 U.S. at 687. First, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. To do so, petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689 (internal quotations omitted). Second, to show prejudice, the petitioner must demonstrate a "reasonable probability" that, but for counsel's errors, the outcome would have been different. Id. at 694-95. If it is clear that petitioner has not satisfied one prong of the Strickland test, the court need not inquire whether he has satisfied the other prong. Id. at 697.

Counsel has no constitutional duty to raise on appeal every non-frivolous issue or argument requested by defendant. Jones v. Barnes, 463 U.S. 745, 754 (1983). Ineffective assistance for failing to appeal a given issue must be determined under the Strickland standard of incompetence and prejudice. Murray v. Carrier, 477 U.S. 478, 488 (1986). Effective appellate counsel must "winnow[ ] out weaker claims on appeal and focus[ ] on those more likely to prevail." Burger v. Kemp, 483 U.S. 776, 784 (1987) (citation omitted).

---

[3] Once he has alleged facts demonstrating a ground for habeas relief, a petitioner must also demonstrate that he developed or attempted to develop those facts in state proceedings. See 28 U.S.C. § 2254(e)(2).

[4] In several sections of his petition, Moore argues that his complaints about counsel's actions or omissions should be considered under the "no prejudice" standard set forth in Cuyler v. Sullivan, 446 U.S. 335 (1980). In Cuyler, the Supreme Court found that where a petitioner shows that counsel had an actual conflict of interest that had an adverse effect on his decisions regarding his representation of the petitioner, petitioner need not prove that counsel's deficiencies prejudiced him. Id. at 349-50. Moore fails to demonstrate that counsel had any conflicts of interest that adversely affected their representation; he simply disagrees with their strategies at trial and on appeal. Accordingly, he fails to establish that any of his ineffective assistance claims must be decided under Cuyler rather than under the two-prong standard set forth in Strickland, 466 U.S. at 687, which requires a showing of prejudice.

### 1. The Missing Witness

In claims (1) and (2), Moore faults counsel for failing to present to the court the full content of Mary Burwell's prior statement to police. On August 26, 2003, Detective Tim Sargent of the Tazewell County Sheriff's office tape recorded an interview with an inmate named Mary Burwell, who was at that time detained in the Roanoke City Jail ("the jail") related to charges of malicious wounding and petty larceny.[5] (Pet. Resp. Ex. A.) Burwell had previously informed authorities that she had information pertaining to Moore's case. She related the following alleged sequence of events to Sargent that she had purportedly learned from talking to Jackson while the two women were housed in the same area of the jail. Jackson allegedly told Moore that the victim owed Jackson money for drugs and gave Jackson some checks, but when Jackson cashed the checks, the victim went to the police to press charges. According to Burwell, Jackson also told her that two or three days later, Jackson and Moore went to the victim's house together, which was next door to Moore's mother's home; they entered with their own key, and then, Jackson (not Moore) slit the victim's throat and stabbed her. Jackson allegedly told Burwell that the victim never woke up, and neither did the victim's child, who was asleep in the residence when the murder occurred. Burwell claimed that according to Jackson, Moore mopped up the mess after the murder, but did not commit the murder.[6]

Within ten days before Moore's trial, the Commonwealth turned over to the defense a transcript of Sargent's interview with Burwell.[7] On the opening day of trial, defense counsel moved for a continuance or suspension of the proceedings so that a defense investigator could

---

[5] Burwell had also been convicted of welfare fraud in another county.

[6] Moore asserts that Burwell's statement (August 2003) gave details about the crime that she could only have known by speaking with Jackson; for example, according to Moore, suspects' names were not mentioned in the newspaper until after the indictment issued in November 2003.

[7] The parties had also discussed Burwell's statement to some extent with the court earlier in chambers. (Trial Tr. 11, Feb. 14, 2005.)

locate Burwell and another potential defense witness, Angela Hairston.[8] (Trial Tr. 10-11, Feb.

14, 2005.) Defense counsel indicated that Burwell's testimony would rebut Jackson's and was

"extremely vital to [the defense] theory of the case." (Id. 11.) The prosecutor represented to the

court that "Ms. Burwell's statement would be—would reflect with the co-defendant's" (referring

to Sarah Jackson). (Id. 11) The prosecutor then informed the court that Burwell was no longer at

the Roanoke City Jail, as she had been released in September 2004 to have a baby and had

absconded. (Id. 12.) Both the defense and the prosecution had subpoenaed Burwell before the

trial, but had been unable to locate her. (Id.) The trial judge denied the defense motion for

continuance and took the motion for suspension under advisement. (Id.)

Sarah Jackson testified for the Commonwealth on February 17, 2005. (Trial Tr. 105-55,

Feb. 17, 2005.) During a conference in chambers which was later commemorated for the record,

defense counsel asked to be allowed to cross-examine Jackson about "prior conflicting or

inconsistent statements that she may have made." (Trial Tr. 6-7, Feb. 18, 2005.) The court ruled

cross-examination on the existence of such statements would be allowed only if counsel first

"la[id] a foundation by inquiring as to whether [Jackson] had made a different statement" and

that cross-examination on "a specific conflicting statement" would be allowed only if defense

counsel was "prepared to offer that prior conflicting inconsistent statement into evidence" or had

"a witness who would be able to testify or be able to prove that conflicting statement." (Id 7.) In

cross-examining Jackson, defense counsel asked:

> Q. Have you ever given a statement to anyone?
> A. No.
> Q. Let me finish my question. Have you ever given a statement to anyone
> else that you are actually the person who stabbed Brandi Hatfield?
> A. No.

(Trial Tr. 142, Feb. 17, 2005.) Deputy Tim Sargent, who had taken the statement from Burwell,

testified twice in the Commonwealth's case-in-chief. Defense counsel did not ask him any

---

[8] Moore does not make any federal habeas claim concerning counsel's failure to obtain Hairston's
testimony.

- 10 -

questions during cross-examination about Burwell's statement or call him as a defense witness to prove the existence or contents of Burwell's statement about Jackson's conflicting comments. (See Trial Tr. 209-233, Feb. 16, 2005; 21-58, Feb. 17, 2005.)

After the Commonwealth rested its case-in-chief, defense counsel stated:

> Your honor, we renew another motion that we made prior to trial. It would be a motion to continue our proceedings due to the fact that we are without at least two very important witnesses to the defense, Angela Hairston and Mary Burwell. Both of which if they were available would allow us to further impeach Sarah Jackson and further would go to our theory of the crime. And I think would go – are more than necessary, they are imperative to any effective defense of Mr. Moore in this case.

(Id. 31.) The prosecutor then stated that "Ms. Burwell has been a fugitive since December. And there is a capias outstanding for her for the last two and a half months. And [neither] the Court nor the probation office knows where she is." (Id. 32.) The judge asked defense counsel, "Are you able to proffer to the Court . . . any information that would enable you to believe that you could locate either of these [witnesses] within the next day or two?" (Id. 33.) Counsel asked for, and was granted, the court's permission to call the defense investigator, but could not reach him. (Id. 34.) At that point, the court denied the motion to suspend the trial proceedings. (Id.)

After trial, on March 8, 2005, counsel moved to set aside the verdict or award a new trial on several grounds. Paragraph 7 of that motion argued:

> The Court erred in refusing to grant Defendant's Motion to Continue or suspend the Proceedings until two vital witnesses were located. The two witnesses, Mary Burwell and Angela Hairston, were vital in the sense that they would have served to impeach the Commonwealth's witness, Sarah Jackson, and further the Defense theory of the case presented to the jury. Subpoenas were timely issued for both witnesses but neither were located prior to the first day of trial February 14, 2005. The motion was renewed at the close of the Commonwealth's evidence as the two witnesses had still not been located. The private investigator used by the defense in their attempts to locate these witnesses has indicated, as of February 22, 2005, Mary Burwell is apparently living with her mother in the Roanoke area and could likely be subpoenaed and brought before this Court if the Court were to grant a new trial.

(Record No. CL07000328, Motion, 2, Mar. 8, 2005.) The state court denied the motion by written order entered June 27, 2005, for the reasons previously given. (Sent. Tr. 17, June 6, 2005.)

- 11 -

Moore asserted a claim on direct appeal that the court erred in denying the continuance so that the defense could secure the testimony of two witnesses, including Burwell. (Ct. App. Order 2-3.) The Court of Appeals of Virginia denied the appeal. The court stated that under Virginia law, "unless the record affirmatively shows an abuse of discretion," the trial court's decision to deny a continuance to obtain witnesses will not be reversed. (Id. 2.) To show abuse of discretion in denying such a motion for continuance, the party must show in the record: (1) the materiality of the missing witness' testimony, including the content of her expected testimony; (2) due diligence in seeking the witness; and (3) a likelihood that the witness would be present to testify at a later date. (Id.) The court found that Moore had failed to present the content of the missing witnesses' testimony in the trial record and had failed to establish any likelihood that Burwell would be available at a later trial date. (Id. 3.) In state habeas proceedings, the Circuit Court for Tazewell County dismissed Moore's ineffective assistance claim on this issue (State Habeas Claim 1) under both prongs of Strickland, based on Moore's failure to present an affidavit from Burwell stating the content of her expected testimony.[9] (Cir. Ct. Order 5.)

In claim (1) of his federal petition, Moore asserts that the prosecutor's terminology – that Burwell's testimony would be "reflective" of Jackson's – caused the trial judge to deny the continuance, believing that Burwell's testimony would be a mirror image of Jackson's testimony. Moore contends that counsel should have objected and informed the court immediately of the content of Burwell's statement to police in order to demonstrate that, in fact, her testimony would directly contradict Jackson's testimony.

Review of the state court records indicates that Moore did submit, as an exhibit to his state habeas petition, a copy of the transcript of Sargent's interview with Burwell. (State Pet. Ex. A.) While this interview was not sworn testimony or a formal affidavit, it was sufficient to give the state habeas courts an indication of the expected content of Burwell's testimony and why it

---

[9] Because the Supreme Court of Virginia dismissed the habeas appeal with a summary order, this court must look to the reasoning of the circuit court's final order as the last reasoned state court decision on the merits of Moore's ineffective assistance claims. Ylst, 501 U.S. at 801-02.

Case 7:08-cv-00526-GEC-mfu   Document 21   Filed 08/12/09   Page 12 of 34   Pageid#: 480

would have been beneficial to Moore's defense, as it directly contradicted key aspects of Jackson's testimony against Moore.[10]  However, for other reasons, the court does not find ineffective assistance here.

First, counsel clearly communicated to the court that Burwell was a key witness for the defense.  Counsel indicated that Burwell's testimony would rebut Jackson's and that it was "extremely vital to [the defense] theory of the case."  (Trial Tr. 11, Feb. 14, 2005.)  Second, the state court clearly based its determination to deny the defense motion for continuance on the fact that Burwell could not be located and not on any misperception by the court that Burwell's testimony would be cumulative of Jackson's or that her testimony was not material.[11]  (Id. 12.)  Third, counsel continued to press the issue, throughout the trial and thereafter, each time emphasizing to the court the potential importance of using Burwell to impeach Jackson as the state's key witness.  The court continued to deny defendant's motions based on Burwell's unavailability.  Accordingly, Moore fails to establish that counsel's failure to object to the prosecution's characterization of Burwell's testimony was either deficient or prejudicial under Strickland.  As the disposition of this claim by the state courts was thus not contrary to or an unreasonable application of federal law or based on an unreasonable determination of facts, the court will grant the motion to dismiss as to claim (1), pursuant to § 2254(d).

In claim (2), Moore argues that counsel should somehow have used Detective Tim Sargent as a witness to state on the record the content of Burwell's statement as impeachment of Jackson.  The state habeas court dismissed this claim under Strickland, noting that a defendant has no right to offer evidence that is inadmissible, but making no finding as to why the Burwell statement would have been inadmissible through Sargent's testimony.  (Cir. Ct. Order 5-6.)

---

[10]  Moore has never submitted an affidavit from Burwell, indicating that she would have been willing to testify at trial about the comments Jackson allegedly made to her.

[11]  Moore admits that counsel did everything possible to locate Burwell, without success until after trial.

- 13 -

The Burwell statement is clearly double hearsay, and as Jackson testified that she had never made a statement to anyone that she had killed Hatfield, the contents of the Burwell evidence could not be used to cross-examine her on that subject. Even if counsel could somehow have convinced the trial court to allow them to use Sargent's testimony to admit the Burwell statement into the record, however, claim (2) fails under the prejudice prong of Strickland. Burwell's credibility was suspect, given her status as a convicted felon likely seeking leniency for herself in exchange for her information. Moreover, the Burwell/Jackson account of the crime – that Jackson murdered Hatfield – is inconsistent with the other evidence in the case. Jackson testified that according to Moore, Hatfield had given him the checks he asked Jackson to forge and that Jackson did not know about Moore's sexual relationship with Hatfield until after the murder. (Trial Tr. 134, Feb. 17, 2005.) Jackson and Moore both testified that she stayed in the motel all night. (Id. 136; Trial Tr. 114-116, 126-27, Feb. 18, 2005.) No evidence placed Jackson at the apartment complex that night or at the murder scene itself at any time. Moore's own testimony is completely at odds with the Burwell statement's version of his involvement in the murder scene cleanup. He testified that in the early morning hours of May 30, 2003, he bought and ingested crack cocaine and then slept it off in an empty apartment at the complex. Thus, the court finds no reasonable probability that the outcome at trial would have been different if the jury had heard Burwell's statement read aloud from the witness stand. As the disposition of this claim by the state courts was thus not contrary to or an unreasonable application of federal law or based on an unreasonable determination of facts, the court will grant the motion to dismiss as to claim (1), pursuant to § 2254(d).

### 2. Voir Dire

It is well established under the Sixth Amendment that

> [t]o hold that the mere existence of any preconceived notion [on the part of a juror] as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

- 14 -

Irvin v. Dowd, 366 U.S. 717, 723 (1961) (citations omitted). If a potential juror demonstrates actual bias, however, she must be removed for cause, and if such a juror is erroneously seated, the resulting conviction must be reversed. United States v. Martinez-Salazar, 528 U.S. 304, 316 (2000). "Actual bias" is defined as "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." United States v. Torres, 128 F.3d 38, 43 (2d Cir. 1997) (citing United States v. Wood, 299 U.S. 123, 133 (1936).

If a juror reveals actual bias and the court fails to dismiss that juror for cause, counsel has two reasonable strategic choices: to let the juror sit on the jury, but preserve and pursue on appeal a challenge to the court's refusal to strike the juror for cause, or to use a peremptory strike to remove the juror. Martinez-Salazar, 528 U.S. at 315. Where the juror has not demonstrated actual bias, however, the court defers to counsel's discretion in whether or not to use a peremptory challenge to strike her from the panel. Gardner v. Ozmint, 511 F.3d 420, 426 (4th Cir. 2007).

In claims (3) and (4), Moore asserts that trial counsel failed to question Howell sufficiently on voir dire to verify her actual bias against drug users, failed to use a peremptory challenge to avoid having her sit on the jury, and failed to preserve an objection to the seated jury, based on the court's refusal to strike Howell and others from the venire for cause. The state habeas court addressed Moore's voir dire claims as a group (State Habeas Claims 6-10), noting that reviewing courts must give deference to counsel's strategic choices regarding jury questioning and use of peremptory strikes and that Moore failed to show that any of the seated jurors was prejudiced against him so as to meet the second prong under Strickland. (Cir. Ct. Order 7.) The record supports the reasonableness of both of these findings.

The court first asked several general questions of the venire members as a group, including:

> Do any of you know of any reason whatsoever as to why you could not be a fair
> and impartial juror in this case and render a verdict based solely on the evidence
> that you hear in this courtroom and the law as given to you by the court? . . . Any

of you know of any reason why you could not be fair and impartial in rendering a verdict in this case?

(Trial Tr. 34, Feb. 14, 2005.) Howell answered in the negative to both questions. The court then called jurors in one at a time for additional voir dire. Defense counsel questioned Howell:

Q:  Do you think that evidence of [the defendant's] illegal drug use in and of itself is enough to make you believe he committed this crime?
A:  No, I think you would have to have more evidence.
Q:  Do you think that would tend to make you believe that he was more likely than not to have committed this crime?
A:  Yes, if it was true.
Q:  Well, do you think it would tend to sway you despite all the other evidence that he would be more likely to commit this crime?
A:  Yes, if it was drug related.

(Id. 187.) The court then questioned Howell:

Q:  [D]o you think that the evidence of [the defendant's] drug usage would cause you to believe that he was more likely then to be guilty of the crime of murder?
A:  No.

(Id.) The prosecutor followed up by asking:

Q:  Simply the fact that someone had been using drugs during or around the time of the commission of a crime, would that by itself cause you to feel more likely that they've committed a crime?
A:  Yes, because if you are on drugs then you are not thinking. . . . [Y]ou can do more things irrational.

(Id. 189.) When the court rephrased its earlier question, Howell answered this time, "Yes, sir."

(Id. 191.) Twice during this questioning, Howell also stated that a juror's decision about guilt would have to involve looking at all the evidence. (Id. 187, 190.)

In refusing to strike Howell for cause, the court stated:

The impression I get from her answer is one that simply [ – ] I think it is reflective of common sense and that is that, yes, a person who is under the influence of drugs or intoxicants is perhaps more inclined to commit a crime th[an] they might be otherwise. And I don't think it shows any type of bias or prejudice that, you know, would make her unfit to serve as a juror and not be able to be fair and impartial.

(Id. 192.) Defense counsel argued that Howell's answers indicated "an attitude that [drug use] is a character flaw. That generally if you use drugs you are going to be more likely to commit a

- 16 -

violent crime." (Id. 193.) The court answered, "And I don't believe that was her answer." Although the court offered counsel an opportunity to question Howell further, they did not do so.

Counsel reasonably could have concluded, as did the court, that taken together, Howell's answers indicated, at most, a commonsense belief that drug intoxication impairs judgment, making a person more likely to commit a crime than he otherwise would, and not a bias against drug users as a group. Moore fails to offer any indication that additional questions of Howell would have revealed actual bias against drug users that would have prevented her from making an impartial decision after consideration of all the evidence. In the absence of proof that Howell was actually biased, the court must defer to counsel's strategic choices as to which venire members to strike with peremptory challenges. Gardner, 511 F.3d at 426. For the same reason, counsel could reasonably have believed that an objection to the seated jury on grounds that the court failed to strike Howell for cause would not meet with success. Moore fails to demonstrate that counsel's actions constituted deficient or prejudicial representation as required to state a claim under Strickland. As the disposition of these claims by the state courts was thus not contrary to or an unreasonable application of federal law or based on an unreasonable determination of facts, the court will grant the motion to dismiss as to claims (3) and (4), pursuant to § 2254(d).

In claim (8), Moore asserts that appellate counsel should have argued on appeal that the court abused its discretion in refusing to strike Juror Dora Bowman for cause. The state habeas court dismissed this claim (State Habeas Claim 17), finding that counsel's performance was not deficient, citing Barnes, 463 U.S. at 754, and Burger v. Kemp, 483 U.S. at 784, and finding that Moore failed to demonstrate prejudice under Strickland. The court cannot find this disposition unreasonable.

Ms. Bowman informed the court during voir dire that she was acquainted with Christopher Dye, who had been subpoenaed by both sides as a fact witness. (Trial Tr. 66-68, Feb. 14, 2005.) The prosecutor questioned Bowman:

- 17 -

| Q: | If [Chris Dye] were to testify do you think you could have a problem sitting on this jury panel and making a fair verdict? |
| --- | --- |
| A: | Well, I think I can make a fair assumption, but I do know – I just have a little problem with that I believe. |
| Q: | Just because of your knowledge of Mr. Dye? |
| A: | Yes, because I've heard him talk, you know, while I was working with him [at McDonald's]. |
| Q: | Have you heard him talk about this case? |
| A: | Yes, see, I worked with him at the time it happened. I didn't realize this was the same case until I seen him really. |
| Q: | And did he go into detail with you about the case? |
| A: | It was not individual, you know. But, you know, just hearing conversations. |

(Id. 67.) The court then questioned Juror Bowman:

| Q: | Based on the fact that you've worked with this Mr. Dye who apparently may be a witness in this case, do you feel that your association with him in the work force there or your relationship with him, your knowledge of him and so forth, would make you even more inclined or less inclined to believe his testimony simply based on your own personal knowledge or relationship with him? . . . |
| --- | --- |
| A: | No, I don't think that would interfere. |
| Q: | Okay. The information that you say he talked about the case, do you recall the information that he spoke of with regards to the case? |
| A: | Not really that much because, you know, you hear rumors. |
| Q: | . . . . Do you feel that anything that you may recall that he said . . . would in any way make it impossible for you to sit in here and put that aside and listen to the evidence that you hear from the witness stand and the law the Court will give you and then consider all the law and the evidence that you hear here in the courtroom, disregarding what you may have heard at work, and render a fair and impartial verdict? |
| A: | I believe so. |
| Q: | You think you can do that? |
| A: | Yes. |

(Id. 67-68.) Defense counsel questioned Bowman briefly:

| Q: | . . . . [B]ased upon the information that you stated may be rumor or may not be that you heard from Mr. Dye at McDonalds, do you think that you've already formulated an opinion based upon those rumors? |
| --- | --- |
| A: | No, I do not. |
| Q: | . . . . If any of the evidence that were to come forward throughout the trial that is consistent with what you have stated could possibly be rumors, would that then push you to believe one thing over another? |
| A: | No. |

(Id. 69.) The defense moved to strike Bowman for cause. The court overruled the motion,

noting Bowman's clear statement of belief that she would be able to reach a fair and impartial

verdict based on the evidence and not on anything she had heard, and her indication that her

- 18 -

acquaintance with Dye did not give her any more or less inclination to find his testimony credible. (Id. 74.)

Dye, nicknamed "Play," testified on February 18, 2005, for the defense. He and his fiancée, Janet Freeman, lived at the same apartment building where the victim lived and knew Moore and Jackson. Dye testified about a visit Moore made to their apartment on May 29, 2003 between about 10:30 p.m. and 11:45 p.m.; Moore talked about a fight Dye had won, and they went for a short walk. (Id. 55-57.) Dye did not notice Moore acting strangely or see any dark stains on his hands or clothing. (Id. 58-59.) He also testified that Sarah Jackson was a jealous woman, although he had spent very little time talking to her. (Id. 60-63.)

On these facts, counsel reasonably could have believed that the record did not support a strong appeal claim that Bowman should have been struck for cause. At the most, Bowman's slight equivocations suggest that she thought her prior contacts with Dye would automatically disqualify her from jury service on the case, but also believed those contacts would not prevent her from being fair and impartial. On appeal, counsel focused on the court's failure to suppress Moore's many inconsistent statements to law enforcement and his letters to Jackson, and challenged the sufficiency of the evidence. The court cannot find that counsel's choice to "winnow out" the Bowman claim was deficient performance. Moore also fails to demonstrate a reasonable probability that raising the Bowman claim on appeal would have resulted in a different outcome. As he fails to establish either prong under Strickland, the disposition of these claims by the state courts was not contrary to or an unreasonable application of federal law or based on an unreasonable determination of facts. The court will grant the motion to dismiss as to claim (8) pursuant to § 2254(d).

### 3. The Victim's Mother

In claim (5), Moore complains that counsel should have objected more quickly to Sue Lockhart's testimony as irrelevant, should have argued that it was more prejudicial than probative, and then should have moved for a mistrial or a cautionary instruction. This witness

- 19 -

testified about who Brandi Hatfield was, how old she was, how many children she had, and how one child had died three and a half weeks before the murder. (Trial Tr. 136-40, Feb. 15, 2005.) At this point in the testimony, defense counsel objected on grounds of relevancy; the prosecutor stated, "I'm just setting the time line for what occurred," and the court overruled the objection. (Id. 139.) Lockhart then testified that after the baby's death, Hatfield had stayed with Lockhart and returned to her own apartment less than two weeks before the murder. (Id. 139.) Lockhart and Hatfield had planned to go together on May 30, 2003, to meet a detective at Goody's so Hatfield could look at security videos. (Id.) Lockhart began calling Hatfield at 5:45 a.m. on May 30, but got no answer. (Id. 139-40.)

The state habeas court dismissed this claim (State Habeas Claim 11), finding that Lockhart's testimony was relevant to show when Hatfield was murdered. This court agrees. Under Virginia law, "[e]vidence is admissible if it is both relevant and material. . . ; [e]vidence is material if it relates to a matter properly at issue [and] relevant if it tends to establish the proposition for which it is offered." Evans-Smith v. Commonwealth, 361 S.E.2d 436, 441 (Va. 1987). The majority of Lockhart's brief testimony covered information relevant and material as to the fact that Hatfield was killed sometime before 5:45 a.m. on May 30, 2003, and before she had a chance to look at the video tapes at Goody's. Certainly, who Hatfield was, where she lived and with whom, what her relationship with her mother was at the time, and plans the two of them had made for May 30, 2003 are all facts that relate the issues of when she was killed, who might have killed her, and why. Thus, counsel reasonably could have believed there were no grounds for further objection, mistrial or cautionary instruction here. Moreover, as there is no suggestion in the record that jurors decided Moore's guilt based on the victim's family situation, he cannot demonstrate any reasonable probability that a mistrial would have been granted or that the outcome of the trial would have been different if an instruction had been given. The claim fails under both prongs of Strickland. The disposition by the state courts was not contrary to or an

unreasonable application of federal law or based on an unreasonable determination of facts, and accordingly, the court will grant the motion to dismiss as to claim (5) pursuant to § 2254(d).

### 4. Character Evidence

Moore complains in claim (6) that counsel should have objected to Sarah Jackson's testimony about Moore's drug use as improper character evidence. The state <u>habeas</u> court dismissed this claim (State <u>Habeas</u> Claim 12) under both prongs of <u>Strickland</u>, finding that Moore himself testified that he was a drug addict and that he was in Hatfield's apartment on the night of the murder. (Cir. Ct. Order 8.) Moore argues that Jackson's testimony about his drug use made it more likely that jurors would believe him to have a propensity to commit the murder.

The court finds no ineffective assistance. Counsel knew that Moore's drug use would be an issue in this case from the beginning, through Jackson's testimony about buying drugs on May 29, 2003 with Moore, as Moore's source of income, and in relation to Jackson's work as a drug task force informer. During <u>voir dire</u>, counsel questioned each juror individually about possible bias against drug users and then had an opportunity to use peremptory strikes to remove individuals whose answers suggested such a bias. The court cannot second guess counsel's strategic decision to address the drug addiction problem in this manner, rather than by objecting to Jackson's testimony about drug use as improper character evidence. Additionally, her drug use testimony was relevant to discrediting Jackson and suggesting that she herself was a suspect to the murder. Moore also fails to show a reasonable probability that an objection would have succeeded or changed the outcome. The court finds no indication that Moore was convicted of this murder because jurors believed that all drug users are criminals. As the claim fails under <u>Strickland</u>, the disposition by the state courts was not contrary to or an unreasonable application of federal law or based on an unreasonable determination of facts. Accordingly, the court will grant the motion to dismiss as to claim (6) pursuant to § 2254(d).

### 5. Sentencing Exhibit

In May 1994, Moore had pleaded guilty in the Juvenile and Domestic Relations Court of Tazewell County to one count of possession of marijuana, one count of possession of crack, and one count of distribution of crack cocaine. At the sentencing phase of the murder case, the prosecutor introduced into evidence as Exhibit A the record of that 1994 proceeding. (Trial Tr. 80, Feb. 19, 2003.) Specifically, the prosecutor stated: "The Commonwealth's Exhibit for sentencing A we would offer as a conviction of the defendant for distribution of cocaine, possession of marijuana, distribution of crack cocaine, distribution of crack cocaine." (Id.) In claim (7), Moore asserts that counsel should have objected to the prosecutor's characterization of these convictions as "false evidence," since three distribution convictions are more serious than his actual convictions from the 1994 case.

The state habeas court dismissed this claim (State Habeas Claim 14), finding that counsel was not ineffective under Virginia Code Ann. § 19.2-295.1, which provides that during a bifurcated sentencing proceeding, the Commonwealth may present evidence of defendant's prior convictions, including juvenile convictions). (Cir. Ct. Order 8.) Exhibit A states the three counts of which Moore was convicted in May 1994, and as such, the state habeas courts found it to be admissible evidence at the sentencing proceeding under § 19.2-295.1.

This court cannot second guess the state court's finding under state law that the exhibit was properly admitted. Estelle v. McQuire, 502 U.S. 62, 72 (1991). Moreover, an objection to the prosecutor's misstatement of the convictions recorded on Exhibit A would merely have resulted in a verbal repetition of Moore's drug convictions, albeit in corrected form. The court cannot find that counsel acted unreasonably under the circumstances in making a tactical decision to allow the exhibit to speak for itself as to what Moore's convictions actually were. In addition, Moore cannot demonstrate any reasonable probability that correction of the prosecutor's misstatement would have resulted in a jury recommendation for a sentence of less than life imprisonment. As the claim fails under both prongs of Strickland, the disposition by the

- 22 -

state courts was not contrary to or an unreasonable application of federal law or based on an unreasonable determination of facts. The court will grant the motion to dismiss as to claim (7) pursuant to § 2254(d).

### 6. Witness Speculation

Early on the morning of May 30, 2003, Levar Neal and his girlfriend Misty Mitchell gave Moore a ride from the apartment complex where the murder occurred to the hospital, where he used a telephone to call for a cab ride back to his motel. Counsel moved in <u>limine</u> for suppression of any testimony by these witnesses, speculating as to what they thought might have been in Moore's hands during that time, arguing that it would be more prejudicial than probative. (Trial Tr. 10, Feb. 14, 2005.) The prosecutor stated that the witnesses would testify only as to what they saw, and the trial judge denied the motion in <u>limine</u>. (<u>Id.</u>) Neal testified that Moore "had like a T-shirt or a towel like sort of rolled under his arm. (Trial Tr. 36, Feb. 16, 2005.) Mitchell testified that when Moore rode with them,

> he had a white towel that was wrapped up long-ways in his hand. . . . It reminded me of a hotel– not a wash cloth. A hand towel. It was about that length. And, like I said, it was rolled up long ways. And it looked solid like it had something in it. It wasn't dangling or anything like that.

(<u>Id.</u> 46-47.) The prosecutor referred to this testimony during closing arguments, suggesting that Moore had been carrying the murder weapon wrapped in that towel under his arm.[12] (Trial Tr. 16, Feb. 19, 2005.)

Moore argued on appeal that the court erred in denying the motion in <u>limine</u>. The Court of Appeals of Virginia refused to consider this claim because counsel did not support it with legal authority. (Ct. App. Order 7.) In his state <u>habeas</u> petition, Moore argued that appellate counsel was ineffective in failing to cite authority (State <u>Habeas</u> Claim 19). The Circuit Court dismissed this claim under <u>Strickland</u>, based on the broad discretion the trial court has regarding what evidence to admit. (Cir. Ct. Order 9.) The court also found no prejudice, noting that even

---

[12] The murder weapon has never been recovered.

- 23 -

if appellate counsel was "deficient for failing to cite authority, . . . [t]he evidence of Moore's guilt was overwhelming [and] Moore [could not] show that the outcome of his appeal would have been different." (Id. 9-10.)

The court agrees that Moore cannot show prejudice under Strickland. The record indicates that Neal and Mitchell did not speculate about what was in the towel, but merely gave physical descriptions of the item they saw in Moore's hands. As the trial court stated, this evidence was more probative than prejudicial, and what inferences to draw from this testimony and what weight to give it were within the province of the jury. The motion in limine thus had no factual support, and the court finds no reasonable probability that citation of authority in support of the claim would have resulted in a different outcome on appeal.[13]

Moore also faults appellate counsel for failing to include supporting legal authority regarding an appeal claim that the court erred in admitting Brenda Fitzgerald's testimony that she overheard Moore and the victim discussing "checks." The appellate court (Ct. App. Order 7) and the state habeas court dismissed this claim (State Habeas Claim 20) based on the same reasoning as applied to the previous claim regarding the towel testimony.

The court agrees that even if appellate counsel's presentation of this claim in the brief was deficient, Moore cannot show a reasonable probability that absent that error, the outcome on appeal would have been different. Other evidence supported a reasonable inference that the victim confronted Moore at some time on the evening of May 29, 2003 about the forged checks. Sandra Reynolds, the bank vice president, testified that on May 29, 2003, Hatfield was quite agitated when she discovered on the morning of May 29, 2003 that her checking account was overdrawn by nearly $ 900. (Trial Tr. 155, Feb. 15, 2005.) Investigator John Murray testified that after he showed Hatfield the WalMart video and identified Sarah Jackson as the person on the tape presenting Hatfield's check, Hatfield was visibly "upset," "bouncing her legs" as she sat

---

[13] Moore argues now that the prosecutor's closing arguments related to the towel testimony were improper and prejudicial. That is not, however, the claim that he raised in his state habeas petition or before this court.

watching the tape, turning red, and shaking her head. (Id. 163.) Jackson testified that while she and Moore were at his mother's house during the early evening of May 29, 2003, Moore sent her to the back room, while he talked with someone who had come to the front door; after the person left, Moore told her that the visitor was Hatfield and that she had told him about going to the police over the forged checks. (Trial Tr. 118-19, Feb. 17, 2003.)

Moore himself told police, and later testified, that Hatfield knew Jackson was Moore's live-in girlfriend, although Jackson was not aware that he and Hatfield had a sexual relationship. (Cmwlth. Trial Ex. 101, p. 34; Trial Tr. 151, Feb. 18, 2005.) Moore's own testimony that when he saw Hatfield twice on the evening of May 29, 2003, she did not discuss the checks at all, is simply not credible. Merely suppressing Fitzgerald's testimony about overhearing Moore's conversation with Hatfield about the checks would not have been sufficient to persuade the jury to accept his version of events, in light of this other evidence that the confrontation occurred. As Moore cannot show prejudice under Strickland, his claim regarding Fitzgerald's testimony about the checks fails. Thus, the disposition by the state courts was thus not contrary to or an unreasonable application of federal law or based on an unreasonable determination of facts, and the court will grant the motion to dismiss as to claim (9) in its entirety, pursuant to § 2254(d).

### D. Court Error Claims

#### 1. Moore's Statements to Jailor

Moore complains in claim (10) that the trial court erred in refusing to suppress two of Moore's statements as given to and recorded by Harry Cundiff, Chief Deputy of the Tazewell County Sheriff's Office.[14] On June 11, 2003, Moore was arrested on multiple forgery and uttering charges related to Jackson's use of Hatfield's checks in May. During this time, he was also a suspect in the murder investigation. On the day of Moore's arrest, he at first indicated that his attorney had advised him not to talk to anyone about the case, but then stated that he would

---

[14] On May 30, 2003, Moore signed a written waiver of his Miranda rights and gave three statements to Tim Sargent, a sheriff's investigator. In his federal petition, Moore does not challenge the trial court's decision to deny his motion to suppress these statements.

- 25 -

talk to Cundiff. (Ct. App. Order 4.) Cundiff then read him his <u>Miranda</u> rights, and Moore signed

a written waiver of those rights. (<u>Id.</u>) Cundiff thereafter recorded a statement from Moore about

events surrounding the victim's death. (Cmwlth. Trial Ex. 99-101.) On two later occasions,

Moore asked to speak to Cundiff, who then took two additional statements from Moore without

first rereading him the <u>Miranda</u> rights: one statement dated July 14, 2003, and another undated

statement. (Cmwlth. Trial Ex. 102-106.)

Trial counsel moved to suppress Moore's statements to Cundiff, the motion was denied,

and Moore appealed. The Court of Appeals of Virginia found that the <u>Miranda</u> waiver Moore

signed on June 11, 2003 applied to the other statements he gave after initiating contact with

Cundiff, because Moore never manifested a desire to revoke that waiver. (Ct. App. Order 5.)[15]

Moore now argues in claim (10) that the state courts erred in failing to suppress the second and

third statements, because the passage of time and other intervening factors between the June 11,

2003 <u>Miranda</u> warnings and waiver and the subsequent statements rendered him unable to

consider his rights. He asserts that at the time the July 14 statement was taken, he approached

Cundiff about being moved out of isolation and did not voluntarily initiate a conversation with

Cundiff about the victim's death. He also argues that the undated statement might have been

taken before he signed the June 11, 2003 <u>Miranda</u> rights waiver.

The Fifth Amendment, made applicable to the states in <u>Malloy v. Hogan</u>, 378 U.S. 1

(1964), provides that no person "shall be compelled in any criminal case to be a witness against

himself." U.S. Const. amend. V. This privilege attaches, however, only when a compelled

statement is incriminating, that is, when it poses a "real and appreciable and not merely

imaginary and unsubstantial" hazard of proving "a significant link in a chain of evidence tending

to establish his guilt." <u>Marchetti v. United States</u>, 390 U.S. 39, 48 (1968) (internal quotations

omitted).

---

[15] Because the Supreme Court of Virginia dismissed the direct appeal with a summary order, this court must look to the reasoning of the Court of Appeals of Virginia's final order as the last reasoned state court decision on the merits of claims (10), (11), (12), (13), and (14). <u>Ylst</u>, 501 U.S. at 801-02.

- 26 -

The initial statement that Moore gave to Cundiff after receiving <u>Miranda</u> warnings on June 11, 2003, which he does not challenge here, gave a lengthy account of Moore's activities on May 29 and 30, 2003. His July 14, 2003 statement and the undated statement to Cundiff were, by contrast, quite brief and do not add any details about Moore's conduct on the days in question. (<u>See</u>, <u>gen.</u>, Cmwlth. Trial Ex. 104, 106.) They include comments from Moore about how much he cared for Hatfield, how he would never do anything to hurt her, and how he will tell Cundiff all the details he needs to obtain the clothes Moore was wearing on May 30, 2003, before he purchased new ones. (<u>Id.</u>) Moore does not point to any specific portion of either of these two statements that tended to prove any "significant link in a chain of evidence tending to establish his guilt." <u>Marchetti</u>, 390 U.S. at 48. As such, he fails to demonstrate that admission of these statements against him violated his Fifth Amendment right against compelled self-incrimination.

For the same reason, even if the state courts unreasonably applied federal law regarding custodial interrogations to this claim, Moore has not established that he is entitled to <u>habeas</u> relief, because he fails to demonstrate that admission of the July 14, 2003 statement and the undated statement had "a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abramson</u>, 507 U.S. 619, 623 (1993); <u>Golphin v. Branker</u>, 519 F.3d 168, 189-90 (4th Cir. 2008) (finding it unnecessary to consider in the <u>habeas</u> context whether state court unreasonably applied <u>Miranda</u> because petitioner failed to make necessary showing under <u>Brecht</u> of "substantial and injurious effect" on the verdict). The court will grant the motion to dismiss as to claim (10).

### 2. Late Disclosure of Witness Criminal History

On August 17, 2004, the trial court ordered the Commonwealth to provide the defense with criminal histories for all prosecution witnesses by September 1, 2004. On February 17, 2005, the defense moved to bar the testimony of Commonwealth's witness Ronald Hall, because the defense had not received Hall's criminal records before trial. (Trial Tr. 6-7, Feb. 17, 2005.) The prosecutor explained that this omission was inadvertent oversight and stated that Hall had

- 27 -

just informed him that the NCIC report of his criminal record just then provided to the defense did not include all of his prior convictions. (Id.) The trial court denied the motion to bar Hall's testimony, noting that if the defense had been provided with the NCIC criminal history report earlier, its information would have been inaccurate. (Id. 7.)

Hall, the maintenance supervisor at the apartment complex, testified that on May 12, 2003, he came to repair a door in Hatfield's apartment, after being told that no one would be home, found Moore in the apartment, and saw him talking on the telephone there. (Id. 10-15.) The prosecutor and defense counsel questioned Hall about his criminal convictions. (Id.)

Moore appealed the trial court's ruling to allow Hall's testimony, arguing that failure to disclose Hall's criminal record before trial was a <u>Brady</u> violation. 373 U.S. 83, 87 (1963). The Court of Appeals of Virginia held that the trial court did not err, reasoning that even if a discovery violation occurred, it did not prejudice Moore's substantial rights because the defense learned of the inaccuracies in time to review and make use of them before Hall testified and because Moore did not move for a continuance or recess to allow further preparation for cross-examination of Hall. (Ct. App. Order 5-6.)

In federal claim (11), Moore reasserts his <u>Brady</u> claim. "Favorable evidence is material, and constitutional error results from its [nondisclosure] by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Kyles v. Whitley</u>, 514 U.S. 419, 433-34 (1995) (internal quotations omitted). Furthermore, "[a] reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." <u>Id.</u> at 434 (internal quotations omitted).

Moore does not offer any specific evidence counsel would have discovered through pretrial investigation of Hall's criminal record or demonstrate how such knowledge would have

Case 7:08-cv-00526-GEC-mfu   Document 21   Filed 08/12/09   Page 28 of 34   Pageid#: 496

enabled counsel to discredit his testimony more effectively than they did.[16] Moreover, although Hall corroborated other witnesses who testified they had been told that Moore had a key to Hatfield's apartment, his testimony was not critical to support the prosecution's theory of the case. Based on Moore's admitted close relationship with the victim and other witnesses' testimony regarding the key, the jury reasonably could have found Moore's testimony – that Hatfield offered him a key, but he refused it because of his relationship with Jackson – was not credible. Thus, Moore does not demonstrate that admission of Hall's testimony, despite the untimely disclosure of his criminal record, undermined confidence in the trial's outcome. Id.

For the same reasons, Moore cannot demonstrate that the late disclosure of Hall's criminal records "had a substantial and injurious effect or influence in determining the jury's verdict" so as to entitle him to federal habeas relief. Brecht, 507 U.S. at 623. The court will grant the motion to dismiss as to claim (11) in its entirety, pursuant to § 2254(d).

### 3. Moore's Letters to Jackson

While Sarah Jackson was incarcerated and continuing after Moore himself was detained, Moore wrote several letters to her. The defense moved to suppress them, arguing that they were prejudicial and not probative of his guilt or innocence; the trial court found them relevant and granted prosecution motions to admit several of them into evidence. (Trial Tr. 7-8, Feb. 14, 2005; see, gen., Cmwlth. Ex. 96, 97, 108.) Moore appealed the court's refusal to suppress Jackson's letters, in particular, the admission of Commonwealth's Exhibit 108. The Court of Appeals of Virginia stated:

> In the letters, [Moore] discussed his relationships with the victim and Jackson. In addition, some of the letters addressed appellant's conduct on the night the victim was killed and on the following days. In one letter, he encouraged Jackson to provide an alibi. Some of the letters contained information contradictory to [Moore's] trial testimony. Therefore the letters were relevant to the issue of whether [Moore] committed the offense and the trial court did not err by admitting the letters into evidence.

---

[16] Moore also vaguely suggests that a more thorough knowledge of Hall's criminal record would have enabled counsel "to expose [H]all's true motive for testifying against" Moore. (Pet. 99.)

- 29 -

(Ct. App. Order 6.)

In claim (12) of his federal petition, Moore challenges the admission of Exhibit 108. The prosecutor used this exhibit during cross-examination of Moore:

Q:     And, again, Terrell, did you kill Brandi Hatfield?
A:     I would never harm Brandi Hatfield.
Q:     You are a violent individual, though, aren't you?
A:     No, sir, I'm not.
Q:     You are not a violent individual?
A:     No, Sir.

(Trial Tr. 183, Feb. 18, 2005.) The prosecutor then showed Moore Exhibit 108, a letter he admitted writing to Jackson after they were both jailed, and asked him to read underlined portions of it:

And for what they've done to you even though I am not with you I will die making them pay for it. I know some of them are gone, but they have family and they have kids and they love and anything closely related to them. My heart has turned to stone for them. I will get them if it is the last thing I do.

(Id. 184.) Moore explained that he was responding to a letter from Jackson, telling him that some of his friends had raped her. (Id. 185.)

A state court's ruling on matters of state law which do not implicate federal constitutional protections, such as the trial court's determination of what evidence to admit, do not present claims cognizable under § 2254. Estelle, 502 U.S. at 72. The habeas court may grant relief only upon finding that the alleged court error under state law "by itself so infected the entire trial that the resulting conviction violates due process." Id. (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973).

Under Estelle, the court cannot second guess the trial court's ruling under state law that the letter was admissible. In addition, Moore has not demonstrated that admission of his letter "infected the entire trial" to such an extent as to undermine confidence in the verdict. In the same letter, he repeatedly expressed his great love for Jackson, and he explained at trial the reasons for his anger at the friends accused of raping her. In other statements and his testimony, Moore described his affection for the victim. Moreover, the jury had ample other evidence from

- 30 -

which to build a reasonable chain of evidence to support a guilty finding, and the court finds no indication that the admission of Exhibit 108 tainted the verdict in any constitutionally significant way. The state court's disposition of this claim was not contrary to or an unreasonable application of federal law or based on an unreasonable determination of facts. Therefore, the court will grant the motion to dismiss as to claim (12).

### 4. Testimony about Television Preferences

Moore asserts in claim (13) that the trial court erred in admitting Jackson's testimony that Moore liked to watch crime shows on television. She did not specify any particular episode or type of criminal investigation on which he focused. Defense counsel moved to suppress such testimony on the ground that it was irrelevant; the trial court denied the motion. (Trial Tr. 137-38, Feb. 17, 2005.) The Court of Appeals of Virginia denied relief on this claim, finding that the testimony was relevant to the Commonwealth's theory that after Moore killed Hatfield, "he tried to cover his actions, for example, by cleaning the crime scene and purchasing new clothes before talking to police."[17] (Ct. App. Order 7.)

As stated, under Estelle, the court cannot grant habeas relief based on the trial court's alleged error under state law in admitting the television testimony unless such an error "by itself so infected the entire trial that the resulting conviction violates due process." 502 U.S. at 72. Moore has made no such showing. The jury could reasonably have inferred from other evidence of Moore's actions after the murder that he was trying to cover up a crime: his inconsistent statements about where he was at the time the murder was committed, evidence that the murder scene had been cleaned up, evidence that he was carrying something when he left the apartment complex early in the morning, and evidence that he changed clothes before talking to police. Accordingly, the court cannot find that admission of the television show testimony made a guilty

---

[17] Moore also asserted to the Court of Appeals that the television testimony was more prejudicial than probative and constituted improper character evidence. (Id.) Because Moore failed to raise these arguments in the trial court, the Court of Appeals found them to be procedurally barred under the contemporaneous objection rule, Rule 5:A:18. (Id.) Such arguments are also procedurally barred from federal habeas review. See Harris v. Reed, 489 U.S. 255, 262 (1989).

Case 7:08-cv-00526-GEC-mfu   Document 21   Filed 08/12/09   Page 31 of 34   Pageid#: 499

verdict more likely so as to taint the jury's decision in any constitutionally significant way. The state court's disposition of this claim was not contrary to or an unreasonable application of federal law or based on an unreasonable determination of facts. Therefore, the court will grant the motion to dismiss as to claim (12).

### E. Sufficiency of the Evidence

Moore's final claim on appeal argues that the evidence was insufficient to support his conviction for murder. After finding the facts noted earlier, the Court of Appeals of Virginia ruled as follows:

> Where the evidence is entirely circumstantial, all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and must exclude every reasonable hypothesis of innocence. . . . Where the circumstances all concur to form an unbroken chain which links the defendant to the crime beyond a reasonable doubt, the circumstantial evidence is sufficient to support the conviction. . . .
> The jury did not accept [Moore's] testimony. The credibility of the witnesses and the weight of the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented. . . . In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt. . . .

(Ct. App. Order 9-10.) (internal quotations and citations to state court precedents omitted).

Any challenge to sufficiency of the evidence presents a federal due process claim. In re Winship, 397 U.S. 358, 364 (1970); Pope v. Netherland, 113 F.3d 1364, 1368 (4th Cir. 1997). To prevail on such a claim, a federal habeas petitioner must establish that, viewing the record evidence in the light most favorable to the prosecution, no rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. at 319. The Jackson standard does not require the habeas

- 32 -

court to ensure that the prosecution's case ruled out "every hypothesis except that of guilt."[18] Id. at 326. "[F]aced with a record of historical facts that supports conflicting inferences [the habeas court] must presume– even if it does not affirmatively appear in the record– that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id.

All of the alleged weaknesses Moore identifies in the Commonwealth's case implicate weight of the evidence and credibility issues. Under the Jackson standard, these functions belong to the jury. The jurors could reasonably have inferred from the testimony and forensic evidence that Moore had motive and opportunity to commit the crime, took efforts after the crime to conceal his actions, and repeatedly lied about where he had been at the time of the crime in order to escape detection. The jury also had ample evidence that Moore's own testimony was of dubious credibility, given his changing version of events and evidence that he had lied on numerous occasions: to cab drivers and to his girlfriends, as well as the police. In short, the jurors had sufficient evidence, or reasonable inferences from evidence, on which they could have reasonably concluded that Moore was guilty of first degree murder. Whether or not this court would have reached the same finding from the trial evidence is not a permissible inquiry under Jackson or under § 2254(d). Moore has not established that no reasonable juror could find him guilty of first degree murder beyond a reasonable doubt, and his claim fails accordingly under Jackson. 443 U.S. at 319. Because this court cannot find that the state court's disposition of this claim was either contrary to, or an unreasonable application of, Jackson as established federal law or based on an unreasonable determination of facts, the court must grant the motion to dismiss as to this claim.

---

[18] Under Virginia law, "[i]t is not sufficient that facts and circumstances proved be consistent with the guilt of the accused. To sustain a conviction they must be inconsistent with every reasonable hypothesis of his innocence." Strawderman v. Commonwealth, 108 S.E.2d 376, 380 (Va. 1959). A federal habeas court, however, does not apply this stricter state standard of review for sufficiency of the evidence, since matters of state law do not rise to the level of a constitutional claim. Inge v. Procunier, 758 F.2d 1010, 1015 (4th Cir. 1985).

Case 7:08-cv-00526-GEC-mfu   Document 21   Filed 08/12/09   Page 33 of 34   Pageid#: 501

## Conclusion

For the stated reasons, the court concludes that the motion to dismiss must be granted. As he fails to allege facts or offer evidence on which he would be entitled to habeas relief, the court cannot find that appointment of counsel or an evidentiary hearing are warranted. Accordingly, petitioner's pending motions will be denied. An appropriate order will enter this day.

The petitioner is advised that he may appeal this decision, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure, if a judge of the United States Court of Appeals for the Fourth Circuit or this court issues a certificate of appealability, pursuant to 28 U.S.C. § 2253(c). A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. § 2253(c)(1). Petitioner has failed to demonstrate "a substantial showing of the denial of a constitutional right." Therefore, this court declines to issue any certificate of appealability pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure. See Miller-El v. Cockrell, 537 U.S. 322 (2003); Slack v. McDaniel, 529 U.S. 473 (2000). If petitioner intends to appeal and seek a certificate of appealability from the United States Court of Appeals for the Fourth Circuit, his first step is to file a notice of appeal with this court within 30 days of the date of entry of this memorandum opinion and the accompanying order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

The Clerk is directed to send copies of this memorandum opinion and accompanying order to petitioner and counsel of record for the respondent.

ENTER: This 12ᵗʰ day of August, 2009.

_Jon Conrad_
United States District Judge

Case 7:08-cv-00526-GEC-mfu   Document 21   Filed 08/12/09   Page 34 of 34   Pageid#: 502